[Civ. No. 17623.   Second Dist., Div. Three.   Mar. 28, 1951.]

J. BRANDON BRUNER, Respondent, v. VAN'S MARKETS (a Corporation), Appellant.

Mitchell, Johnson & Bates for Appellant.

Meserve, Mumper & Hughes and William Larrabee for Respondent.

WOOD (Parker), J.—Action to recover broker's commission for services rendered in connection with a sale of real property. Defendant appeals from judgment in favor of plaintiff for $5,280.

Appellant (defendant) contends that plaintiff is not entitled to any commission since there was no writing signed by defendant unequivocally showing the employment of plaintiff as required by the statute of frauds.

In January, 1946, defendant, Van's Markets, contemplated the construction of a warehouse, the estimated cost of which at that time was $350,000. On January 31, 1946, the plaintiff, who was vice-president of Nelson Douglass and Company, wrote a letter, as such vice-president, in behalf of said company to defendant wherein that company offered to obtain for defendant a sale and lease-back agreement as a means of financing the construction of a warehouse. In that letter it was stated that the commission payable to Nelson Douglass and Company for its services "upon completion and signing of all papers incident hereto" should be 4 per cent of the total amount involved, but in no event should the compensation exceed $12,000. In a letter dated February 11, 1946, defendant accepted the offer of Nelson Douglass and Company

and agreed therein to pay said company for its services 4 per cent of the total amount involved, ''but in no event shall said compensation exceed the sum of $12,000.00.'' As a result of the services of Nelson Douglass and Company, acting through its vice-president, the plaintiff herein, the defendant (Van's Markets) and the Occidental Life Insurance Company entered into a written agreement on May 27, 1946, which provided, among other things, (1) that the insurance company would purchase the warehouse when completed and the land upon which it was built at the actual cost of the warehouse and the land, which cost should include the commission of $12,000; and (2) that it would then lease the property to defendant for 40 years, and give defendant an option to repurchase the property at the end of the lease term for $37,500, which amount was the cost of the land. It was estimated therein that the cost of the warehouse would be $400,000. On May 28, 1946, after the signing of the agreement but before the building was completed and before all the documents pertaining to the transaction with the insurance company had been executed, the defendant paid to Nelson Douglass and Company as broker's commission $12,000 in full payment for all services rendered or to be rendered. In September, 1946, there was a dissolution of the Nelson Douglass and Company.

During the first part of January, 1947, or the latter part of December, 1946, Mr. Garrett, the treasurer of defendant, called plaintiff by telephone and said (according to plaintiff's testimony) that '' [W]e find now that the building is going to considerably exceed the original estimated cost and our contracted figure for delivery,'' and that he would like for plaintiff to take it up with the officials of the insurance company and ascertain whether they would be willing to make some concession in view of the fact that the costs were exceeding considerably the price for which they were committed to deliver the property, and that the cost would be $100,000 more than the contract price of $400,000. Plaintiff then explained to Mr. Clark, the president of the insurance company, the situation in which defendant found itself, and asked him if he thought the insurance company would be willing to make some concessions. Mr. Clark replied that his company was willing to give the matter consideration, and he (Mr. Clark) suggested that rather than to try to establish a new figure at that time ''it would be better if they deferred consideration of the

matter until the completion of the building at which time they would have the property price in its completed state and try to establish a fair value at that time." Plaintiff then related that conversation to Mr. Garrett, the treasurer of defendant. Thereafter, during the period until September, 1947, plaintiff had various conversations with officers of the insurance company and with Mr. Garrett regarding the matter.

On September 6, 1947, plaintiff went to defendant's office and told Mr. Garrett that plaintiff needed a letter to present to the insurance company in presenting a request for a change in the amount of the purchase price. Mr. Garrett said, "All right," and that plaintiff could dictate to Mr. Garrett's secretary approximately what he would like to have included in that letter. Plaintiff then dictated a draft of the letter, which draft was received in evidence as defendant's Exhibit D. That exhibit is a sheet of yellow paper with typewriting upon it, and it shows that the letter was to be addressed to "Mr. J. Brandon Bruner 510 South Spring Street Los Angeles, California." There was no statement in the draft that any commission was to be paid to plaintiff or anyone for services in connection with the proposed increase in the selling price. Mr. Garrett, as treasurer of defendant, wrote a letter to Mr. Bruner on September 6, 1947,[1] and he testified that said letter

---

[1]"Los Angeles 54, California
September 6, 1947

"Mr. J. Brandon Brunner
634 South Spring Street
Los Angeles 14, California

"Dear Mr. Brunner:

"We are enclosing herewith a schedule of the final cost on the Warehouse and General Office we have had under construction during the past year. This cost is submitted to you in connection with a resale agreement that you negotiated for us with the Occidental Life Insurance Company.

"As you will recall, at the time that the agreement was entered into, we were unable to secure a fixed bid on the cost of this construction but estimated that the cost would be approximately $400,-000.00, and the agreement was written up on the basis of this estimated cost.

"We now find, however, that the cost has run considerably over this estimate due to the rise in labor and material costs, even though, during the construction of the same we made every effort to hold down these costs by allowing no work to be done on Saturdays or other overtime periods.

"We are also attaching herewith a series of statements from the Joshua H. Marks Company which further amplify the reason for the additional cost.

"In view of the wide discrepancy between the cost and the stipulated sales price, we wish you would ascertain whether or not the Occidental Life Insurance Company is willing to consider a re-appraisal of this

was made from the said draft (Exhibit D). At the time that letter was written the warehouse had been completed and the cost of it was known. Also at that time the defendant knew there had been a dissolution of Nelson Douglass and Company. In that letter it was stated, among other things, as follows: (1) "[W]e wish you would ascertain whether or not the Occidental Life Insurance Company is willing to consider a re-appraisal of this property in the light of these new developments, and to consider a change in the sale price to one which is more realistic in view of the actual cost of this project"; and (2) "We ask that you take this matter up with the Occidental Life Insurance Company and, as soon as you are able to determine their position on these two matters, we would appreciate talking with you further." The schedule of costs which was enclosed in the letter is omitted from the footnote herein. That schedule contained an item of $12,000 for commission, but it did not contain any other item regarding commission.

Plaintiff received said letter of September 6th and delivered it to the insurance company. The insurance company re-appraised the property at $576,000. On November 17, 1947, the insurance company and defendant entered into an escrow, and they signed escrow instructions whereby the insurance company agreed to buy the warehouse and land for $576,000,

---

property in the light of these new developments, and to consider a change in the sale price to one which is more realistic in view of the actual cost of this project.

"Since the loan was negotiated, the invested capital has been doubled, with and addition of $375,000.00 in Preferred stock. The statement for the year ending December 31, 1946, shows a substantial improvement in the net worth. An additional $250,000.00 in preferred stock is now being sold and the proceeds will have been received by the 25th of September, bringing the Capital Investment over the $1,000,000.00 and the net worth in excess of $1,500,000.00.

"We feel that with these changes in our net worth structure, we are in a position to ask for an adjustment in the terms of this sales agreement. We would like the sales price to be increased to the actual cost of the completed building as reflected in the attached schedule. We also believe that our agreement to deposit $105,000.00 in Government Bonds as security is not now necessary.

"We ask that you take this matter up with the Occidental Life Insurance Company and, as soon as you are able to determine their position on these two matters, we would appreciate talking with you further.

Yours very truly

Van's Markets

By J. E. Garrett
J. E. Garrett
Treasurer"

which was an increase of $176,000 in the purchase price. On November 26, 1947, the deed, lease, and other documents required to complete the transaction were executed and the sale was made to the insurance company for $576,000. Thereafter plaintiff asserted that defendant should pay a commission of $8,800.

As above stated, appellant contends that the letter of September 6, 1947, did not constitute a written contract of employment of plaintiff as required by the statute of frauds. He argues that the letter fails to show unequivocally that plaintiff was employed; that the letter shows doubt and uncertainty as to the intention of the parties; and that the letter was not intended to be an employment contract or a memorandum of such a contract. The letter referred to the first resale agreement and to the circumstances under which that agreement was written. Then the letter stated the financial problem with which defendant was confronted, at the time the letter was written, by reason of the fact that the cost of the warehouse was considerably more than the original estimate. Reference was made therein to the increased value of defendant's assets, and it was then stated that the defendant felt that by reason of those changes in its net worth it was in a position to ask the insurance company for an adjustment in the terms of the first sales agreement. It was also stated therein that defendant wanted the sales price of $400,000 (which the insurance company had already agreed to pay) increased to the actual cost of the building as shown by the attached schedule (which was $621,738.86). As above stated, defendant also said therein, in substance, that it wished that plaintiff would ascertain whether the insurance company would be willing to consider a reappraisal of the property in the light of the new developments and to consider a change in the sales price in view of the actual cost of the project. Also as above stated, defendant asked the plaintiff, in that letter, to take the matter up with the insurance company, and then the defendant said therein that as soon as plaintiff was able to determine the insurance company's position in the two matters the defendant would appreciate talking further with plaintiff.

It therefore appears from the letter (1) that defendant advised plaintiff concerning defendant's financial problem, which was that the warehouse had cost about $200,000 more than the original estimate of $400,000 for which it had agreed to sell the property to the insurance company; (2) that de-

fendant wanted to resell the property to the same purchaser (the insurance company) at a price which was about $200,000 higher than the price for which the insurance company was then entitled to buy the property; and (3) that defendant authorized and employed plaintiff to negotiate with the insurance company and to resell the property at the higher price, namely, the actual cost of the property. In other words, the defendant stated in the letter what it desired to have done, and it authorized and asked plaintiff to do it. It is true that the letter did not state that plaintiff would be paid a commission. ■ A memorandum required by the statute of frauds (Civ. Code, § 1624, subd. 5) need not include a statement that a commission will be paid. (*Caminetti* v. *National Guar. Life Co.*, 56 Cal.App.2d 92, 95 [132 P.2d 318].) "In the absence of any agreement as to commission, the agent, if authorized in writing to negotiate a sale of real estate, is entitled to a reasonable compensation for his services." (*Ibid.*) In the present case there was testimony that in the telephone conversation between Mr. Garrett and plaintiff, about January, 1947, Mr. Garrett said: "Mr. Bruner, this is a very serious matter and we are not expecting you to work for nothing."

■ An agreement to pay a commission may be shown by parol. (*Caminetti* v. *National Guar. Life Co., supra,* p. 95.)

Appellant also contends that since it (Van's Markets) had paid Nelson Douglass and Company $12,000 in full payment for all services rendered or to be rendered, and since plaintiff was vice-president of that company when it agreed that in no event should the commission exceed $12,000, and since plaintiff had rendered the prior services on behalf of that company, it was not intended that any commission should be paid for plaintiff's services in the subsequent transaction regarding the increase in the selling price of the property. It also argues that a further indication that no commission was intended on the subsequent transaction is that the schedule of costs enclosed in the letter of September 6th (which plaintiff presented to the insurance company) did not include an item for additional commission. As stated above, there was a dissolution of Nelson Douglas and Company in September, 1946. Plaintiff testified that he discussed the dissolution of that company with Mr. Garrett at "one of the very early conversations" with Mr. Garrett after the telephone call from Mr. Garrett in which Mr. Garrett asked him "to do the new deal." Mr. Garrett testified that "some time later than this first con-

versation'' plaintiff told him that the company had been dissolved. ■ In any event, defendant knew at the time the letter of September 6, 1947, was sent to plaintiff that there had been a dissolution of Nelson Douglass and Company about one year previously—in September, 1946. The letter was addressed to plaintiff individually. The court found that at all times during the employment of plaintiff in connection with the sale for $576,000 plaintiff was acting in his individual capacity and defendant knew that plaintiff was acting in his individual capacity as a broker and not as an officer or agent of Nelson Douglass and Company; and that it is not true that, at any time during which plaintiff rendered services in connection with the sale for $576,000, it was understood or intended by plaintiff and defendant that the services of plaintiff were being rendered by or for Nelson Douglass and Company or its successor within the terms of the agreement of February 11, 1946, or for a total compensation not to exceed $12,000. Those findings are supported by the evidence. The contention that it was not intended that plaintiff should be paid a commission is not sustainable.

■ Appellant also contends that the evidence does not support the finding that defendant ''agreed orally with plaintiff to pay him the reasonable value of his services under his written contract of employment.'' There was testimony, as above shown, that about the first of January, 1947, the treasurer of defendant told plaintiff that the financial problem confronting defendant was a very serious matter and the defendant did not expect him to work for nothing. Thereafter during a period of approximately 10 months plaintiff had various conversations with officers of the insurance company and said treasurer regarding the resale of the property at an increased price. In November, 1947, the insurance company bought the property for $576,000 and defendant was released from its prior contract to sell the property to the same insurance company for $400,000. Defendant accepted the benefits of plaintiff's services. Said finding that there was an oral agreement to pay plaintiff the reasonable value of his services is supported by the evidence.

■ Appellant also contends that plaintiff is estopped to claim a commission because he did not expressly include an agreement for a commission in the letter of September 6th, because an additional commission was not included in the schedule of costs which was enclosed in that letter, and because plaintiff did not ask for a commission before the increase in

the selling price had been obtained. This contention is not sustainable. Estoppel was not pleaded. That alleged defense was raised for the first time on appeal. There was no finding regarding such an estoppel. It seems that appellant is arguing that this court should find as a fact that plaintiff was estopped to claim a commission. It cannot be said properly that if a finding had been made regarding estoppel it would necessarily have been favorable to defendant. All intendments are in favor of the judgment. This court is not empowered under the circumstances here to make a finding regarding estoppel. The evidence was legally sufficient to support a finding that plaintiff was not estopped.

By reason of the above conclusions, it is not necessary to determine other contentions of appellant.

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 24, 1951.